## THE PEOPLE *vs.* BROOKS.

In suits to recover a penalty, where no general form of declaring is given, the plaintiff must set forth the particular acts and omissions which constitute the cause of action.

And where the general form allowed by 2 *R. S.* 482, § 10, is resorted to, the section of the statute imposing the penalty must be accurately referred to.

Where a penalty was imposed partly by a provision of the revised statutes, and in part by a section of an act passed in 1831, and the declaration referred to the latter provision as a section of the revised statutes according to the number affixed to it in a reprint of these statutes, embracing subsequent public acts; *held* erroneous, and that no recovery could be had under the declaration.

The statutes of this state requiring the payment of a sum of money for hospital purposes from masters of vessels engaged in the foreign and coasting trade, for each of the *officers and crew* of such vessel, are in conflict with the provision of the constitution of the United States investing congress with the power to regulate commerce, and of the laws of the United States passed in the exercise of that power, and are therefore void. *Per* BEARDSLEY, J.

So far as such state acts require payment from shipmasters on account of *passengers*, the enactments are constitutional and valid. *Per* BEARDSLEY, J.

DEBT, for a penalty of $100. The declaration contained a single count, which alleged that the defendant "heretofore, to wit, on, &c. at, &c. was indebted to the said plaintiffs in the sum of one hundred dollars, whereby an action hath accrued to the said plaintiffs, according to the provision of the statute 'Of the marine hospital and its funds,' to wit, of sections ten and twenty-two of chapter fourteen, title four of part first of the revised statutes of the state of New-York, to demand and have of and from the said defendant the said sum of money above demanded." Breach, non-payment of the sum of $100. Plea, *nil debet.*

The cause was tried in July, 1844, at the New-York circuit, before KENT, late C. Judge. The plaintiffs proved that the defendant was the master of the steamboat Nimrod, which plied between Bridgeport, Connecticut, and the city of New-York, and that the boat, with the defendant as master, on board, arrived at the city of New-York in January, 1844; that after her arrival the president of the trustees of the "Seaman's fund

and retreat" demanded of the defendant the hospital money claimed to be due that institution for the month of January, which the defendant refused to pay. Upon this evidence the plaintiffs rested, and the defendant moved for a nonsuit, on the grounds, 1. that the declaration misrecited the statute; 2. that the action should have been in the name of the president of the Seaman's fund and retreat. The motion was denied and the defendant excepted.

The defendant gave in evidence a coasting license issued to him, as master of the Nimrod, on the 24th day of June, 1843, by the collector of the customs of the United States for the district of Fairfield in the state of Connecticut, (in which the port of Bridgeport is situated,) authorizing the defendant to carry on the coasting trade with the steamer Nimrod, for one year from that date. It was proved that the owners of the Nimrod resided in the state of Connecticut, and that the defendant, as master of the boat, had paid to the collector at Bridgeport twenty cents per month for the master and each of the crew of the boat from the date of the license to the time of the trial.

The defendant insisted, and requested the judge to charge, that the law of this state requiring the payment of hospital money from the masters of coasting vessels for their officers and crew, was a violation of the provision of the constitution of the United States conferring on congress the power to regulate commerce, and of the laws of the United States passed in the exercise of that power. The judge refused to charge as requested, but on the contrary instructed the jury that if the defendant had refused to pay the hospital money, pursuant to the laws of this state, for January, 1844, after due demand had been made, the plaintiffs were entitled to recover the penalty demanded. The defendant excepted, and the jury found a verdict for the plaintiffs. The defendant moves for a new trial, on a case.

*J. L. White,* for the defendant.

*T. W. Tucker,* for the plaintiffs.

BEARDSLEY, J. In penal suits, unless a general form of declaring is expressly authorized by statute, the declaration must set forth the particular acts or omissions which constitute the cause of action and by which the alleged penalty was incurred. This is the invariable rule. (1 *Chit. Pl.* 405 ; *Cole* v. *Smith,* 4 *John.* 193 ; *Bigelow* v. *Johnson,* 13 *id.* 428 ; *Collins* v. *Ragrew,* 15 *id.* 5.) But we have a statute which dispenses, in such cases, with any statement in the declaration of the " special matter," and makes it sufficient to allege the defendant's indebtedness " in the amount of such penalty or forfeiture, to the officer, person or body, to whose use the same is given ; whereby an action accrued according to the provisions of such statute, naming the subject matter thereof, in the following form, ' According to the provisions of the statute concerning sheriffs,' naming the section, title and chapter of such statute, as the case may require, or in some other similar terms referring to such statute." (2 *R. S.* 482, §§ 10, 11.) To this extent certainty and particularity are still requisite ; the statute may be indicated by any intelligible reference to its subject matter ; but the particular section or sections imposing the penalty, together with the title and chapter containing the same, must be stated truly.

The declaration in this case alleges that the action " accrued to the said plaintiffs according to the provisions of the statute ' *Of the marine hospital and its funds,*' to wit, of sections ten and twenty-two of chapter fourteen, title four, of part first of the revised statutes of the state of New-York." Title four here referred to, is the said statute " *Of the marine hospital and its funds,*" (1 *R. S.* 444,) and this action is alleged, in the declaration, to have accrued according to sections *ten* and *twenty-two* of said title. But the title has only twelve sections, and there is a palpable error in the averment that the action accrued, in any respect, according to section twenty-two of this title. How this error arose will presently appear.

The seventh section of said title declares that the health commissioner shall be entitled to receive " the following sums,

from the master of every vessel that shall arrive in the port of New-York, namely :

" 1. From the master of every vessel from a *foreign* port, for himself and each cabin passenger, one dollar and fifty cents; for each steerage passenger, mate, sailor or mariner, one dollar.

" 2. From the master of each *coasting vessel*, for each person on board, twenty-five cents; but no coasting vessel from the states of New-Jersey, Connecticut and Rhode Island, shall pay for more than one voyage in each month, computing from the first voyage in each year." These moneys are denominated "hospital moneys," and were appropriated by said title to the use of "the marine hospital" on the easterly side of Staten Island. (§ 8.) By the tenth section of said title it is declared that every master of a *coasting* vessel, who omits to pay such hospital moneys as may be demandable under said title, shall forfeit the sum of one hundred dollars.

This statute, it should be observed, gives a penalty for the non-payment of twenty-five cents for each person, *whether passenger or one of the crew*, on board such coasting vessel, which payment was to be made to the health commissioner for the use of the marine hospital on Staten Island. But in 1831 the system then in force for the collection and application of hospital moneys underwent several important modifications. By the act of that year, entitled "An act to provide for sick and disabled seamen," certain persons were designated, and provision was made for the choice of others, as "the trustees of the seamen's fund and retreat in the city of New-York." The act also declares that "the respective sums of money now levied and collected by law *upon masters, mates, mariners and seamen*, arriving at the city and port of New-York, shall be collected and paid over to the" said trustees. (*Laws of* 1831, *p.* 273, § 1.) The trustees were to erect or hire a building to be called the "seamen's retreat," which was "to be exclusively appropriated to and for the use of sick and disabled seamen," (§ 2,) and to this object the moneys to be collected and paid "upon masters, mates, mariners and seamen" were to be applied. So much of section seven of title four of the revised statutes, already

referred to, as authorized the commissioners of health " to re-
ceive and collect hospital money from *masters, mariners or
seamen,*" was repealed by said act of 1831 ; but the act declares
that nothing therein contained shall " prevent said health com-
missioners from collecting from the master of every vessel such
sums as may be due from such master for any steerage or cabin
*passenger* as provided in" said seventh section. (§ 9.) Thus
the hospital moneys to be paid by masters of vessels were sever-
ed ; the part payable on *passengers* remaining as before, to be
paid to the health commissioners; but that which was payable
" upon *masters, mates, mariners and seamen,*" was to be paid
to the trustees of the seamen's fund and retreat. (§ 11.)

The rates of payment to be made by masters of vessels from
*foreign* ports, have undergone various changes since 1831,
(*Laws* 1843, *p.* 284 ; *Laws* 1844, *p.* 477 ; *Laws* 1845, *p.* 249 ;)
although the law, as to *coasting vessels* has, I believe, in this
respect, remained unchanged. By the act of 1831, the moneys
payable to the trustees of the seamen's fund and retreat,
were to be collected by the president of said trustees, who was
also thereby authorized to " sue for the penalties imposed by
law on masters of *coasting* vessels for not paying any hospital
money." (§ 11.)

Assuming the validity of the statutes which have been re-
ferred to, the defendant, as master of the Nimrod, was required
to make payment of hospital moneys at the time when this
action is supposed to have accrued, as follows :

1. The amount payable on his *passengers* to the health
commissioners ; and 2. The amount payable on *the crew* of his
vessel, to the president of said trustees, to be expended by them.
And for an omission to do either he was liable to a penalty of
one hundred dollars.

The hospital moneys demanded in this case were such as were
supposed to be payable on the *crew* of the Nimrod, and which,
by the terms of the act of 1831, were to be paid to the president
of said trustees, and not to the commissioners of health, as di-
rected by the revised statutes. The action therefore accrued,
if it accrued at all, under the act of 1831, as well as under the

revised statutes. But the declaration makes no mention of the act of 1831, nor does it contain any intelligible reference to its provisions. It however does allege that the action accrued according to section *twenty-two* as well as section *ten*, of the title of the revised statutes which has been mentioned. This we have seen was a palpable error, the title containing but *twelve* sections in all. It is probable, however, although the declaration contains nothing on which to rest the conjecture, that the pleader who drew this declaration, really intended by the reference made to section twenty-two, to indicate the eleventh section of the aforesaid act of 1831. The mistake, it is not unlikely, occurred in this manner. In the republication of the revised statutes, in 1836, such acts of a general and public nature as had been passed subsequently to the revised statutes, were "inserted in those titles and articles where the same or similar subjects are contained;" (*Preface to the 2d ed. ;*) and accordingly under title four "of the Marine Hospital and its funds," section eleven of the act of 1831 is inserted, and there designated as section twenty-two. But this does not make it a part of title four, or of the revised statutes; and notwithstanding the section is thus printed and numbered, in a re-print of those statutes, it is, as it was originally, a part of the act of 1831, and nothing more. The pleader, therefore, made a fatal mistake in stating that his cause of action accrued wholly under title four of the revised statutes, whereas it accrued, if at all, in part under the act of 1831. He was bound to indicate the sections giving the penalty, truly, which was not done in this case.

When the plaintiffs came to the trial, it was proved very clearly that the defendant had refused to pay hospital moneys for the *crew* of his vessel, to the president of the trustees, as required by the terms of the act of 1831; and if the legislation on this subject has not run counter to the constitution of the United States, a good cause of action may have been established. But it was not a cause of action arising solely under title four of the revised statutes, but in part, under the act of 1831. The declaration, which alleged an action accruing

wholly under the revised statutes, was not proved, and for this eason the plaintiffs should have been nonsuited.

But the case presents a much more important question than the one we have been considering. It is objected that the legislation of the state on which the action rests, is in conflict with the constitution and laws of the United States, and this point is now to be examined. By the legislation of the state, as we have seen, every master of a vessel from a foreign port, or of a coaster, arriving at the port of New-York, is required to pay a certain sum for each person on board, whether passenger, officer, or one of the crew. It is not material here to state the particular sums to be paid on different classes of persons, nor the uses to which the money is to be applied. The object may be purely benevolent and charitable, and the sum demanded but a mere trifle, still, the legal character of the exaction does not depend upon, nor will it be at all affected by such considerations.

It is important to note the distinction between payments required to be made for passengers and such as are demanded on account of the officers and crew of a vessel. In the case of *Turner* v. *Smith*,(a) this court held that the statute imposing a tax on passengers was constitutional. That judgment was affirmed by the court of errors, and no doubt is entertained of the correctness of that decision. But the present case has reference to a tax on the *officers and crew* of the vessel, and the penalty is sought to be recovered for a refusal, by the master, to pay that tax. It is obvious that this is very distinguishable from a tax on passengers, and that the validity of the state

---

(a) Turner, as health commissioner, sued Smith to recover one dollar each, pursuant to 1 *R. S.* 445, § 7, *subd.* 1, for two hundred and ninety-five *steerage passengers* brought into the port of New-York, on board the ship " Henry Bliss," whereof the defendant was master. The defendant demurred to the declaration, and on the argument insisted that the state act was unconstitutional. The supreme court in May term, 1842, gave judgment for the plaintiff. In the opinion delivered by *Bronson, J.*, it is said that the case was virtually decided by *The City of New-York* v. *Miln*, (11 *Peters*, 102.) This judgment was subsequently affirmed by the court for the correction of errors.

law, as applicable to the two cases, depends on very different considerations.

Passengers, as was said in the case of *The City of New-York* v. *Miln*, (11 *Pet.* 136,) "are not the subject of commerce;" nor are they, like the officers and crew of a vessel, indispensable agents of navigation. A tax on the former may not therefore be, in any sense, a regulation of commerce, although a law, imposing a similar burthen on the officers and crew, might well be regarded as of that character.

Congress, as the constitution of the United States declares, have power "to regulate commerce with foreign nations, and among the several states." (*Art.* 1, § 8, *sub.* 3.) The word commerce, as here used, is not limited to the mere buying and selling of merchandize and other commodities, but comprehends the entire commercial intercourse with foreign nations and among the several states. It includes navigation, as well as traffic in its ordinary signification; and embraces ships and vessels as the instruments of intercourse and trade, as well as the officers and seamen who navigate and control them. The power of regulation vested in congress extends to all these sub jects. (*Gibbons* v. *Ogden*, 9 *Wheat.* 189, *et seq.*; *Brown* v *The State of Maryland*, 12 *id.* 445 *to* 448; *City of New York* v. *Miln*, 11 *Pet.* 134 *to* 136, 141, 154, 5.)

This power has been exercised by congress in the passage of a multitude of acts on the subject. Of this description are the laws which provide for the registry of ships and vessels engaged in foreign trade, and the enrolment and license of coasters and fishing vessels. And of the same nature are those which require the payment of small sums, at stated periods, by all seafaring persons on board the ships or vessels of the United States. These laws impose burthens, as they also confer privileges upon all persons engaged in the business of navigation; and they all rest on one and the same foundation, the power vested in congress "to regulate commerce with foreign nations, and among the several states." It is not intended to analyze or enumerate the various laws on this subject, and reference will only be made to one or two of them.

The People *v.* Brooks.

" An act for enrolling and licensing ships or vessels to be employed in the coasting trade and fisheries, and for regulating the same," was passed in 1793. It declares that certain ships or vessels, " and no others shall be deemed ships or vessels of the United States, entitled to the privileges of ships or vessels employed in the coasting trade or fisheries." (1 *Story's Laws U. S. p.* 285, § 1.) And by the fourth section of that act, on giving a proper bond and paying the duty required by law, a license to carry on such trade or fishery is to be given.

· By the " act for the relief of sick and disabled seamen," passed in 1798, it was made the duty of " the master or owner of every ship or vessel of the United States, arriving from a foreign port into any port of the United States," to render a true account of the number of seamen employed on board such vessel since her last entry at any port in the United States, and to pay to the collector " at the rate of twenty cents per month for every seaman so employed ; which sum he is hereby authorized to retain out of the wages of such seamen." (*Id. p.* 554, § 1.) A like payment, to be retained out of the wages of every seaman employed in the coasting trade, is also required to be made, by said act. (§ 2.) And a similar payment is to be made by " the officers, seamen and marines, of the navy of the United States." (*Id. p.* 685, § 2.) These moneys are designed for the temporary relief and maintenance of sick or disabled seamen ; and if a surplus shall remain, it is to be used in providing hospitals for the accommodation of such persons. (*Id. p.* 554, 685 ; 2 *id. p.* 878, 1186.)

The mere grant to congress of a power to regulate commerce may not, *ipso facto*, have deprived the states of a concurrent power ; but the power vested in congress has been exercised in the manner and to the extent deemed proper by that body, and the regulations thus made are still in full force. By these regu·· lations burthens are imposed on seamen as well as ship owners, and the precise question is, can additional burthens now be cast upon them by the states. In other words, can a state tax the occupation of a mariner, employed in the foreign or coasting trade, or the fisheries ; or, is not the payment of monthly dues

to the United States, an unqualified license and authority to pursue this occupation, without let, hindrance, or impediment of any sort from state authority? For myself, I think nothing can be plainer than that this is a power which a state cannot exercise. In principle I see no difference between the case at bar and that of *Brown* v. *The State of Maryland,* (12 *Wheat.* 419.) It was decided in that case, that an act of the state of Maryland, which required importers of foreign goods, by the bale or package, to take out a license to sell the same, for which fifty dollars was to be paid, was repugnant to the power vested in and exercised by congress, "to regulate commerce with foreign nations." (*Id.* 436, 445, *et seq.*) "Sale," say the court, "is the object of importation, and is an essential ingredient of that intercourse, of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right, not only to authorize importation, but to authorize the importer to sell." (*Id.* 447.) Again, same page, "what does the importer purchase if he does not purchase the privilege to sell?" And in conclusion it is said, "any penalty inflicted on the importer for selling the article in his character of importer, must be in opposition to the act of congress which authorizes importation." "The distinction between a tax on the thing imported, and on the person of the importer, can have no influence on this part of the subject. It is too obvious for controversy, that they interfere equally with the power to regulate commerce." As to the acknowledged power of a state to tax its own citizens or their property, it was said, "We cannot admit that it may be used so as to obstruct or defeat the power to regulate commerce." "It cannot reach, and restrain the action of the national government within its proper sphere. It cannot reach the administration of justice in the courts of the union, or the collection of the taxes of the United States, or restrain the operation of any law which congress may constitutionally pass. It cannot interfere with any regulation of commerce." (*Id.* 448, 9.) So in the case at bar, what right does

a mariner purchase by the payment of his monthly tax to the United States, or the master who pays the legal duty on his vessel, if a state may step in and impose additional burthens on one or the other? What right is secured by the license to pursue the coasting trade, if its exercise may be obstructed or shackled by state regulation? Obviously, no such power should be possessed by a state. It should not be allowed to obstruct or impede the constitutional action of the general government, nor can it impose taxes or duties, in any form, on what that government has authorized. (*See* 4 *Wheat.* 425, *et seq.*)

In the present case the *Nimrod* had been enrolled and licensed, from year to year, to engage in the coasting trade; consequently her crew had, from time to time, paid monthly dues to the United States, and those on board were liable to make similar payments. (1 *Story's Laws U. S. p.* 554, § 2.) What was gained by this payment if not a right to follow the occupation of a mariner in absolute independence of all state control? If this occupation may be taxed by New-York, it also may be by every other state into which the mariner enters, in the pursuit of his calling, and in this manner the unity and harmony of the regulations of congress will be effectually destroyed.

In exercising the power to regulate commerce, congress may "make all laws which shall be necessary and proper for" the purpose. (*Const. Art.* 1, § 8, *sub.* 17.) Such as were deemed necessary or appropriate, have been made, and they form a part of the supreme law of the land. (*Art.* 6, § 2.) As such they un avoidably exclude all state legislation which would, in any degree, change or modify the system of congress. The states cannot add to the regulations made by the paramount power of congress, nor subtract any thing from them. The subject matter, having been acted upon by congress, was thereby placed completely beyond the reach or control of the states. (9 *Wheat.* 197, *et seq.;* 11 *Pet.* 158; *Steamboat Co.* v. *Livingston,* 3 *Cowen,* 743.)

I must admit that I feel no doubt about this case. It seems to me to rest on the precise principle which was stated as one ground of the judgment in the case of *Brown* v. *The State of*

*Maryland.* In my opinion, the legislation of the state on which the present action is attempted to be maintained, cannot be upheld. It conflicts with regulations which have been made by congress under and in accordance with the constitution, and is necessarily inoperative. The laws of congress are paramount, and the legislation of the state must give way. On this ground, then, as well as on that first stated, there should be a new trial.

BRONSON, C. J. and JEWETT, J, concurred in granting a new trial on the first question discussed in the opinion of BEARDSLEY, J.; but not having examined the constitutional question, they expressed no opinion upon it.

New trial granted.(*b*)

(*b*) This and the following cases reported as of this term, were decided in vacation in June, 1847, and the judgments entered as of the preceding May term.